MARVIN GELFAND Good morning, Your Honors. May it please the Court, Marvin Gelfand on behalf of the appellant, also seated at council table from my office, is Jason Poston. The district court in this case stated in the first sentence of the decision that this case tests the bounds of trademark law. Yet even though it tests the bounds of trademark law, the district court not only found that there was not a likelihood of success on the merits, it also found that there were no serious questions going to the merits. This appeal from the denial of a preliminary injunction goes to the heart of those two findings. The likelihood of success on the merits, of course, deals with the Ninth Circuit case of Monte Carlo v. Daewoo, decided by this Court some 22 years ago. The serious question going to the merits deals with one of the items that the district court ignored, even though it mentioned it in its decision. It mentioned in its decision very clearly, as well as oral argument, that the Australian litigation that is taking place may very well impact this case. There's a contract provision between the parties and a number of contract provisions based upon the separation of the business and based upon the heads of agreement that was entered into. The district court acknowledged that that case may very well impact whether or not the defendant in this case has the authority to sell the disputed wines. Yet the district court, even acknowledging that that was still an issue, determined that there was no serious legal question. In order for the court to have reached that conclusion, it had to do two things. One, it had to determine that the Monte Carlo Daewoo case applies and the right of the control of the first sale no longer exists between a manufacturer and a trademark holder. Before you get to that, I'm interested in the relationship between the breach of contract issue and the trademark issue. Does in any way the question of whether there's a breach, it might not determine the question of whether there was a trademark violation, but is your request for relief dependent in any way on the fact that there was or was not a breach of contract? Does it matter? We believe that it does matter because of the potential effect of license or negative license that's controlled in the contract. The Lanham Act obviously starts with the sentence that unless the parties agree to the contrary, and then it goes on to state what the various rules are. The courts recognize that license agreements are an effective way of limiting or controlling the use of a trademark. Here, when the parties separated, there was an agreement where the marquess parties gave up the rights to use the trademark. The question is, though, do you, with the status being that it's unclear whether there's a breach of contract. That's correct. Are you entitled to an injunction? We believe we're entitled to an injunction because the existence of the contract is an affirmative defense that needs to be approved in order for there not to be a trademark violation. Unless there's an approval by the trademark holder, in the first instance, there's a trademark violation. The existence of a license agreement is an affirmative defense to a determination whether or not there's a trademark infringement claim. Here, in order to establish marquess's rights to sell off the wine, because that was the first sale, as the district court acknowledged. The first sale was not from the trademark holder, but from marquess to Joshua Tree. In order for marquess to be able to sell the wine to Joshua Tree, it first has to establish that it has a right to do so under the contract. That would require an establishment that there was a breach of the contract by the Phillips parties in Australia. Without that, marquess is simply trading on the marquess Phillips trademarks that it no longer owns and that it gave up. Counsel, do we have to resolve the question of how the Australian court is likely to rule? I don't think so. I think the Australian court is running its course, and it will run its course shortly. But as the district court recognized. Is there a hearing set? Is there a time for decision in Australia? There is. The case has been moved to a single judge in order to establish a hearing. I do not believe that a trial has been set yet. I do believe, or at least I'm advised, that it should take place in the first six months of 2007. I can't offer anything more to the court because I'm not part of that procedure. Your case is premised on the assumption that there wasn't a breach of contract by your client. If there was, we don't even get to a trademark. Well, that's one part of the case. That isn't the sole part because there are still issues with the Monte Carlo decision that, regardless of that, need to be decided by this court. But our client sued, obviously, for breach of contract in Australia, contends that, indeed, that there was a breach of contract. If Marquis did breach the agreement under the heads of agreement and the other collateral agreements that the parties executed, Marquis does not have the right to sell off the wine using Marquis Phillips labels. That, then, would be a trademark. If it's your client that breached the agreement, then they may. Well, there are two questions. Then they may. That is correct because there's language in the contract that still is subject to interpretation in the Australian courts dealing with what the Marquis rights may be. But for the purposes of this discussion, we've conceded that, that if, in fact, my clients did breach the contract, Marquis was authorized to sell the wine into an unrestricted market, which is what the language says. Before a court gives an injunction to you, shouldn't it have the feeling that you're likely to prevail on the breach of contract claim? Not necessarily, Your Honor, because the court stated that it wasn't going to resolve that. The question in order to determine an injunction is twofold, of course, with a sliding scale. First, the likelihood of success on the merits or probability of success on the merits. Second, the question of a serious legal question going to the merits, where the court then is obligated to balance the respective hardships. The court below recognized the serious legal question because there's the breach of contract, but it refused to take the next step and balance the hardships. The district court concluded that there wasn't a serious legal question without consideration of the contract issue, simply by referencing the Monte Carlo case, that there's no likelihood of success on the merits, at least under its opinion. But once it determines that there's a question that's a serious question that goes to the merits in a trademark case for injunction purposes, it then has to take the next step, and the district court below refused to take the step of balancing the requisite hardships. And that's where the court was in error based upon the case that proceeds in Australia. Counsel, let me turn to the question of hardship. And I want to suggest that we have some open questions after Monte Carlo and that the answer is not entirely clear. If we were to permit the sale, that is to affirm the district court and not grant the stay, and we are wrong, what are the consequences to your client? What measure of damages would you have if we failed to issue the stay? There are several measure of damages. And I've got a follow-up question to that. The simple response to that, and the simple one, of course, would be if the wine is being sold in the marketplace and there's an infringement and we're successful in establishing the infringement, then we'd get the profits that we'd otherwise be entitled to. My client would get those profits. There are a number of cases establishing damages. The problem, though, is, as we've created in the record, is the impact upon the trademark itself. When you have a potential confusion in the marketplace, which is taking place or did take place at the very beginning, recall when this injunction was brought and the state of the record before this court, no wines were here in the country. These were prospective sales, and there was a stipulated restraining order that kept all of the wines in Australia until the preliminary injunction could be heard. Based upon simply the offering of the wines for sale, there were all the blogs on the websites by individuals looking at the wines saying, Is this real? Can this be genuine? The Grateful Palate seems like it's dumping wines on the market. Maybe it's Marquis. They're having a dispute. Somebody that's on the record even wrote and said, I'm going to cancel all of my orders with the Grateful Palate, and I'm going to advise every restaurant that I do business with to cancel their orders because you're obviously selling wines at a cheaper price to someone else because you've been the exclusive distributor. This is a harm and an impact that is immeasurable. How would you measure that confusion in the marketplace? How would I measure it at the time of trial? I assume that under our laws you'd be entitled to some measure of damages. I would presume so as well, and we haven't reached that point yet, but of course I'd go hire economists or experts in order to attempt to determine what the impact would be upon the brand, what the impact would be upon the Grateful Palate as a result of the conduct of the defendants. These damages, of course, are necessarily suspect because they do raise questions as to whether they're speculative. It's the type of damages that are, of course, done in antitrust cases all the time. Let me alter the hypothetical. Let me flip it. What if we were to stay the sale? What if we were to issue the stay that you have requested, and later on, because of events in Australia, it's determined that we stated incorrectly? What then are the damages that Marquis would be entitled to? How are those measurable? That's exactly why I believe that the Monte Carlo case should either be distinguished or dealt with by this court and put to where it is. This is the only case that exists in any of the circuits where the first sale between the trademark holder and a party has been eliminated by the courts. Every other case, including some of the cases that have allowed the sale, have determined that there was an applied contract between the parties that allowed it. Monte Carlo is standing out alone as the court recognized from the restatement, from what McCarthy states, and every other circuit. And this court took pains in every decision. I'd like to get an answer to my question. What are the damages? What are the damages? If we issue a stay on behalf of your client, and let's suppose that the Australian court then determines that there was a contract, and the marquee had the right to sell the wine in the United States, and we have now stayed those sales, is your client going to be liable in damages? Yes, Your Honor. How is that measurable, and how hard is it going to be to quantify that? Much easier to quantify it, because Marquis has produced the wine. He has his expenses for the production of wine. There is a price set that Philips owes Marquis for the wine. If Marquis can't sell the wine because of conduct by Philips, then Marquis would be entitled to the price of that wine plus interest, which is his damages. If the wine gets harmed in any fashion because Philips says don't sell it, and Philips turns out to be wrong, those damages are set by the contract. They're very easily ascertainable, and nobody's harmed. Does Joshua Tree have damages here as well, lost profits? We don't believe so, because prior to the time Joshua Tree brought the wines here, we put Joshua Tree on notice, and it's in the record, that they were proceeding at their own risk, and I think Judge Wilson in the Central District case, I don't remember the case, even acknowledged that. No, no. and it didn't get it at the low price it bargained for, are its damages measurable? I would presume they would be, Your Honor, but I truly haven't considered that in this case. I think you'd have to look at the entire situation with Joshua Tree. But then we're dealing with their damages of specific loss of profits on a sale. We're not talking about a harm of a trademark. We're not talking about the impact of future business. If you get the stay, and we've issued it wrongly, that is, you're going to lose in Australia, so that we should not have issued the stay, then the contract damages are easily calculated for Marquis, and probably any lost profits on the sale, probably easily calculated by Joshua Tree. Much easier than any of the trademark damages and the harm to the brand that gets caused the other way around. I'd like to take it. There's about six and a half minutes left. I'd like to leave a few minutes for rebuttal, so I would request that the Court focus for just one minute on the Monte Carlo decision with me. The Court has, as I stated, taken pains to suggest that it's not Lanham Act. The Lanham Act shouldn't be decided based upon where the port of entry is for goods, or it shouldn't be decided by clever attorneys forum shopping. Haven't we already said that Monte Carlo was based on California law? You have said that. But the district court below stated in its decision that the law is indistinguishable between the Ninth Circuit law and California law, and therefore Monte Carlo is the law in this jurisdiction. It also recognized that the Ninth Circuit is in the minority. Most cases follow the El Greco analysis that state that there must be a first sale. The trademark holder is protected at the point of the first sale. After the first sale, then it becomes a different issue. Then it becomes similar to the gray market cases that the district court analyzed by dealing with genuineness of product. But the decisions of all courts are a product is not genuine unless it has been authorized by the trademark holder. The district court found that the first sale was not by the trademark holder, but rather by Marquis to Joshua Tree. If the court pleases, unless there are other questions, I'd like to reserve my remaining five minutes for rebuttal. Thank you. Your Honor, your Honors, my name is Iris Siegel. With me is Scott Schabel. We represent the Joshua Tree in this case. Let me start off with hitting a couple of points that Plaintiff's counsel has made. One is he says that Monte Carlo was the only case like this. Well, there's the recently cited McCoy case which we briefed. Counsel has said that the courts are following El Greco. Counsel, Monte Carlo, as I read it, was applying California law. I think he said as much in subsequent cases. Is that a considered decision of the Lanham Act or is this panel bound by Monte Carlo? The answer is yes and yes. The court in Monte Carlo was applying Ninth Circuit law under the Lanham Act. We've cited cases to you in our briefs that have pointed out that the two, the law of the Ninth Circuit in California disregard a congruent. The Ninth Circuit case of NEC, that case cited Monte Carlo and decided the same way. With respect to El Greco, El Greco is a very interesting case. There the court said the goods are not authorized goods until a certificate has been issued pursuant to a contract. As a matter of fact... First question, before you get to El Greco, because that's the Second Circuit. There was, as Judge Bybee said, a case after Monte Carlo in which we said that's cited under California law. Are you saying that since then there are Ninth Circuit cases that adopt Monte Carlo as a Ninth Circuit position on the Lanham Act? Yes, the NEC case, Your Honor. The which? NEC Electronics. This is Cal Circuit. And you say that that case adopts Monte Carlo as a Ninth Circuit law. Can you tell us what specifically? Give me a second, Your Honor. Okay, NEC Electronics at page 1509 and 1510 says trademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent. And they say, see Monte Carlo. Yes, and then they say once the trademark owner sells his product, the buyer ordinarily may resell it. Because they were now addressing the specific facts in NEC. In NEC you had a situation where there was a sale and the goods were out of the trademark holder's hand. Your Honor, let me point out that the first sale doctrine is a shield. It's a defense that defendants throw up. It is not a sword. This is a type of case where the goods are being held by let's say the manufacturer. And then the buyer, which in this case is the trademark owner defaults. That's the case here. That's the case in the McCoy case. Which if I recall is a Fifth Circuit case. Identical facts. The goods are authorized goods. They're identical to anything that's being sold by the trademark owner. The trademark owner says, you know what? I think I don't want to buy this anymore. I don't want to be involved in this product. So they now stop. In our particular case, what you have is the Grateful Pallet agrees to have 120,000 cases of the wine made. And the deal is that it's going to be made by the winemakers Sarah and Sparky Marquis. They make the wine. 120,000 cases. Everyone says the wine is wonderful. Approximately 80,000 cases are given pursuant to their agreement to the Grateful Pallet. That left about 38,000 cases. Of those 38,000 cases, those also were to be delivered to the Grateful Pallet. But the Grateful Pallet, for every single case they were to get, they were supposed to hand over money. Well, after just over 10,000 cases, the Grateful Pallet says, no, we're tired of this deal. We don't want this deal anymore. And they don't care that they left Sarah and Sparky Marquis stuck with another 28,000 cases. They said, no more. Well, at that particular point, under California law, the UCC, similar law in Texas was decided in the McCoy case, even under Australia law, and pursuant to their contract, once Sarah and Sparky Marquis was stuck there with the Marquis Philips wine. That's what the product is. That's what people wanted. That's what they were stuck with. They had the right to resell it. The Joshua Tree has the right to rely on cases such as Monte Carlo. They have a right to rely on standard business practices and to buy that wine. To buy that specific wine. The Joshua Tree made its own bed, and they're going to have to lie with it. Meanwhile, the facts are clear. There's no difference between the wines that Joshua Tree is selling and that the Grateful Pallet is selling. The quality control differences matter. We have this whole case as pretext. Plaintiff starts off with a pretext breach. Oh, there's 2.4% of the product is missing, which is the back end. Stuff is going to be delivered at the very, very end. 2.4% is missing. We don't want to be involved in this anymore, so we're not going to do it. Then they come up and they tell the district court, these are all the things that we're concerned about as far as quality is concerned. But not once do they say what they did about it. It's all ghosts. It's all mirrors. Nothing is as they say. They said there's no other case besides Monte Carlo. Well, there's McCoy. They cite El Greco. El Greco does not apply. As a matter of fact, there's a case in the Second Circuit which specifically said, and if you give me a second, I'll point it out to you. It's the Holford USA versus Cherokee case. We cite it on page 20 of our brief. They specifically distinguished El Greco. The Second Circuit case, it's the Southern District of New York. They distinguish El Greco the exact same way we do. El Greco said the goods are not authorized goods because the contract said there had to be a certificate. No such thing exists here. The Sparky Marquis wines were authorized goods from the get-go. So Monte Carlo applies. And as I said, we cited a Second Circuit case. They know about it and they don't tell you about it. With respect to the Australia case. That case, we have a belief as to who's going to win. But that case... Do you have any different information from opposing counsel on when that's scheduled and how that's going to be resolved? We have no idea when it's going to be resolved. But I can tell you this. No one is seeking injunctive relief in that case. There's undisputed facts that the goods are being sold in Australia so that if Joe Blow Exporter buys the goods in Australia, it's an authorized sale and it can be sold over here to an importer in the United States. As I said, there's no injunctive relief being sought in Australia. Plaintiff had the opportunity at the district court to say, we've got this case in... Plaintiff is plaintiff in Australia. We are... The Joshua Tree is not a party in Australia. Plaintiff is and he could have gone up and waved. Hey, we're seeking injunctive relief. Plaintiff is not seeking injunctive relief in Australia. Counsel, would you address the same questions I put to Mr. Gelfand about the hardship and about the measure of damages? I'll rephrase the question. You don't need to. With respect to the measure of damages, you mean for the Joshua Tree? Well, I'm also interested in Marquis. I asked for both, I believe. Well, with respect to Marquis, they have to prove that there is infringement. They have to prove that this is not a classic great goods case because they're allowed to be sold. Assuming that Marquis can win, then it's a matter of showing what their damages are. As far as damage to the mark is concerned, all the evidence is consistent. The goods are exactly the same and they're authorized goods. So you're getting into an area where, gee, it's hard to show there's any damage to the trademark. There's only damage to who had the right to trade on it. That does suggest then that the question as to what damages that Phillips would be entitled to on his allegation that there was confusion in the mark would be a much more difficult case. And it's not even confusion in the mark. The confusion he described were people being ticked off at the high price that the Grateful Pallet was charging. Now, every single case that deals with this says that's not a trademark concern. That may go to... That would depend on who had the right to control the first sale, wouldn't it? First sale does not... If in fact... The cases that you may be trying to reach for are the cases where you have a manufacturer who over-manufactures. And then you have to worry about, gee, are these things good to go? Are these non-defective products? In our particular case, the entire product package, all 120,000 cases was approved by all the parties involved. Sarah and Sparky Marquis on the one hand, and the Grateful Pallet, and Mr. Phillips. So we're not in one of those situations where the product is a non-authorized product. And like I said before, first sale is a shield, not a sword. With respect to the damages for the Joshua Tree, Joshua Tree would be entitled to the money it would have made if it were allowed to make the sales. But then there's the issue of what about Joshua Tree's reputation? It is holding itself out as somebody who's entitled to sell these products. It has made contracts that it may not be able to deliver on. So if there is an injunction imposed upon the Joshua Tree, there are damages which would be very hard to determine. And those deal with reputation. And reputation is the same type of damage that you're involved with with trademarks. Because trademarks stand for reputation. I would conclude this matter by saying that my points, unless you have other questions, that people like the Joshua Tree have a right to rely on precedent. Monte Carlo was good precedent. Monte Carlo was upheld by NEC. Monte Carlo was upheld, even in view of El Greco, by the Holford case. The Joshua Tree has acted exactly in accordance with typical U.S. law. When there is a default, the manufacturer has the right to sell the products to other buyers. And that's all that the Joshua Tree did here. Do you have any other questions, Your Honor? Thank you. Thank you, Your Honor. I hope not to take up my full five minutes unless there are questions of the Court. Counsel first stated that we misled the Court with respect to no other cases like Monte Carlo. Cited a Second Circuit case, I think the Cherokee case, which is not a Second Circuit case, it's a district court case. And in that particular case, there were specific issues related to bankruptcy and the actual finding of the breach by Cherokee and allowed the Party to sell the goods under local law. In the McCoy case, the Court found an implied right to sell the goods based upon the course of dealing between the parties. In fact, it stated it was an implied license to sell the goods, but it was based upon the history of the course of dealings. The Monte Carlo case has no such element. This case has no such element because there are express agreements between the parties either authorizing or prohibiting the sale of goods. No implication can be found to the contrary. Monte Carlo stands out there alone as the only case on its facts alone that states that the first sale between a manufacturer and a trademark holder does not have to be authorized. To that extent, if that's how that case is being treated and the district court treated it that way, it should be disapproved. The NEC case is a parallel import case. It is a case where the first sale had been authorized abroad and, in fact, they were trying to protect the parallel imports. The Court refers to it as, and analyzes, of course, the great goods cases. What this Court has done in a number of cases since Monte Carlo is recognize the trademark holder's right as a monopoly. Last year in the State of Idaho potato case, this Court stated that trademark owners have a monopoly over their marks, which they can license as they see fit. In the Intel case, the Court specifically stated that one of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold and the Court continued, trademark holder has the right to control quality of its product through its own authorized distributors. One of the issues presented to the District Court is wine being volatile and perishable needs to be protected at each step of the way. The wine had yet to be brought into this country. The District Court properly found that we didn't put forth any evidence saying that Joshua Tree would import the wines any different from the Grateful Palate. We had no ability to prove that. But as this Court has recognized, it's the rest of the way. The distribution of the wines, the selection of the distributors who will maintain the quality, the distributors' selection of the retailers, that is important for the protection of the brand. Every Court has recognized, including this one, that the trademark holder has the right to control the distribution and that's where the control of product and the genuineness of the product comes in. The District Court ignored that in the decision. It was set forth in Mr. Phillips' declaration as to how and the importance of the selection of the distributors by the Grateful Palate. In this case, one of the issue of damages, and I forgot to mention this before, Your Honor, is that, like the Bill Blass case in the Third Circuit, the Grateful Palate offered to allow them to change the labels. The price to change a label and the evidence submitted was between $0.13 and $0.33 a bottle. That includes the principal labor part of taking the wines out of the cases in order to do that. Joshua Tree has acknowledged that it did change the labels by at least over-stickering part of the back label in order to show that it was the import and not the Grateful Palate. They were required to do that by federal law, so they already went through the process of engaging in the labor. The cost to do that was pennies, but Joshua Tree chose not to do that because it wanted to trade on the famous mark of a wine that in five years has gone from 7,000 or 8,000 cases a year to 120,000 cases a year, a wine that has become very famous in the marketplace, and they wanted to trade on that. The Court has to recognize that Joshua Tree is a competitor. Marquis is now a competitor because he's dealing with his own label, as Joshua Tree acknowledged, and the prices were set to and did, in fact, impact the reputation of Joshua Tree. We will submit on that basis. Thank you. Thank you, counsel. Case just argued will be submitted.
judges: Reinhardt, Bybee, Burns